**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| HENRY ADAMSON, Petitioner, | : | Civil No. 06-3194 (PGS) |
| v. | : | **O P I N I O N** |
| RONALD CATHEL, et al., Respondents. | : | |

**SHERIDAN**, District Judge:

On July 14, 2006, the instant petition for a Writ of Habeas Corpus, executed pursuant to 28 U.S.C. § 2254(a) ("Petition"), was filed on behalf of Henry Adamson ("Adamson"). The Petition challenges Adamson's judgment of conviction rendered by the Superior Court of New Jersey, and is accompanied by an application to proceed in this matter in forma pauperis. See Docket Entry No. 1. For the reasons detailed below, the Petition will be denied.

## PROCEDURAL BACKGROUND

The Petition challenges a judgment of conviction filed on October 9, 1998, after a jury convicted Adamson on eighteen counts, including robbery, conspiracy to commit armed robbery, aggravated assault, and unlawful possession of weapon. See Pet., ¶¶ 1-6. Being a persistent offender, Adamson was sentenced to life imprisonment with 25 years of parole ineligibility. See id., ¶ 3.

Upon appeal, the Appellate Division affirmed his convictions and sentence.  Thereafter, the Supreme Court of New Jersey denied certification, and the United States Supreme Court also subsequently denied certiorari on June 4, 2001, including Adamson's argument that "the cross-examination of [Adamson] on two statements made by non-testifying co-defendants implicating him in the robbery" without a limiting instruction warranted reversal of his convictions.   Id. ("Instructions Challenge").

Having lost on his direct appeal, Adamson sought post-conviction relief by way of an application filed by a public defender, Linda E. Peterson ("Peterson").  Such relief was denied in the New Jersey Superior Court, Law Division, on May 4, 2004; he then appealed such denial with assistance of Thomas Menchin, Esq. ("Menchin"), a pool counsel appointed by the Office of Public Defender, and who previously represented Adamson at trial.  The Superior Court of New Jersey, Appellate Division affirmed the Law Division's decision on November 1, 2005, and the Supreme Court of New Jersey likewise denied any action.

During the aforesaid proceedings for post-conviction relief, Adamson raised three concerns.  First, that Adamson's trial counsel was ineffective; second that his appellate attorney, Taylor, was ineffective; and third, that his "sentence was illegal because the judge imposed a sentence higher than the presumptive term based on a finding of fact not reflected in the jury's verdict and because he found those facts under a preponderance-of-the-evidence standard. Id. ("Sentencing Challenge").

On March 20, 2006, two months after the Supreme Court denied his certification with regard to the aforesaid application for post-conviction relief, Adamson, pro se, filed another

application for post-conviction relief which was denied on June 9, 2006.[1] See id. Adamson did not appeal that denial.

The instant Petition does not state Adamson's exact grounds raised in this action, but the two addressed herein concern Instruction Issue and the Sentencing Issue.

**STATEMENT OF FACTS**

The underlying events indicate that Adamson, together with five co-defendants, was criminally charged as a result of a hold-up of an "after[-]hours social club" named Brother's Candy Store "by men wearing masks and carrying firearms" on December 4, 1995. The facts are well stated in the decision of the Appellate Division and are set forth below. Id. at 2.

> After the assailants entered Brother's, everybody was told to raise their hands and get down on the floor. . . . [Shortly thereafter,] Patrolman Sudol . . . received a call to respond to a disturbance at Brother's. He arrived to see five individuals leaving the club. Three of the five men ran . . . northbound, while two others made left and ran [in another direction]. Sudol followed the two men . . . and ultimately caught up with Derren Napier [who] was taken into custody. Sudol then got back into his police car and chased the second subject [who] initially stopped [and] stated he was not doing anything [but then] started running. After radioing a description of the subject, Sudol returned to Brother's [and] found a fully loaded machine pistol on the floor, which was identified by one of the patrons as one of the weapons used by the masked robbers. . . . Sudol [then] returned to headquarters where he saw the second person he chased, Gaumaal Aljamaar, [Adamson's] cousin, in a police holding cell.
>
> Both Napier and Aljamaar provided statements which were transcribed on a computer at headquarters [("Napier and Aljamaar's statements")]. Based upon the[se] statements, the police arrested [two other defendants,] Ian Green . . . and Timothy Dixon . . . .
>
> [Adamson, Aljamaar's cousin,] soon became a suspect. On December 17, 1996, [Adamson] received a telephone call from his girlfriend, Ivette Robinson, telling

[1] During this period, Adamson and his trial attorney, Taylor, discussed his case. Evidently, Taylor agreed to undertake representation of Adamson so long as Adamson did not bring a claim against Taylor. This was corroborated on the record in this court by both Taylor and Adamson.

> him that she was being charged with conspiracy to commit robbery[2] and the police was looking for him in connection with the same robbery. [Adamson] surrendered himself to the police at Newark's Penn Station and was taken to the police [headquarters where] Detective Julius Cirelli . . . explained [to Adamson that] he would take [Adamson's] statement[-confession]. . . . Because the[] assailants were masked, [Adamson's confession] was the primary evidence against him. Like the [statements of other defendants charged in connection with the robbery, Adamson's confession] was transcribed on a computer. . . . [E]ach answer was initialed and the final page [was] signed by [Adamson.]
>
> In the [confession, Adamson] described the other individuals involved and explained how the plans for the robbery came about [as well as how he and the other four assailants met, what kind of guns they prepared for the robbery, how they executed the robbery, and how Adamson was running away from Sudol among the three assailants that ran northbound]. In the [confession, Adamson] acknowledged that he made a mistake committing the robbery and [verified] that what he described was accurate. He swore his [confession] was true and described his treatment at [the] headquarters as "good."
>
> [Adamson's confession] was admitted into evidence during the State's case. [Adamson] testified on his own behalf. He denied being present at Brother's and being involved in the robbery. [Rather, he asserted that] Detective Cirelli told him that he was going to charge [Adamson's] girlfriend if [Adamson] did not give him [a false self-inculpatory] statement. [Adamson] indicated that Cirelli [went about ensuring that Adamson would give a false self-inculpatory statement by first giving Adamson] the statements given by Napier and Aljamaar and "told him to read them and make [Adamson's corresponding] statement." [Then, according to Adamson, both Adamson and Cirelli] "sat down at a computer and started typing [Adamson's false confession," which was a two-hour process].

Id. at 4-8.

On direct examination, Adamson asserted that the confession he gave to Cirelli was inaccurate because Cirelli threatened to criminally charge Adamson's girlfriend unless Adamson confessed to the same facts as two other culprits (Napier and Aljamaar) had. Consequently, the prosecutor, during Adamson's cross-examination, asked questions aiming to impeach Adamson's culpability. The prosecutor focused on two aspects of Adamson's confession: (a) the

[2] Apparently, Robinson's car was one of the cars used by the assailants to arrive to the scene of the robbery.

effectiveness and logic of the confession-producing process allegedly employed by Cirelli, ("Process-Ineffectiveness Aspect"); and then (b) the content of his confession by comparing it with the content of Napier and Aljamaar's statements and establishing that these statements were inconsistent with Adamson's confession ("Inconsistency Aspect"). See id. at 9. The apparent goal of the prosecutor was to show that Adamson's confession was voluntarily produced by Adamson, as Adamson saw fit. See id. at 9-10.

## DISCUSSION

### I. Standard of Review

Section 2254(a) of Title 28 of the United States Code gives the court jurisdiction to entertain a habeas petition challenging a state conviction or sentence only where the inmate's custody violates federal law. 28 U.S.C. § 2254(a).

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); 28 U.S.C. § 2254(a); accord Barry v. Bergen County Probation Dep't, 128 F.3d 152, 159 (3d Cir. 1997). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." Smith v. Phillips, 455 U.S. 209, 221 (1982). Generally, "[i]f a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable," Engle v. Isaac, 456 U.S. 107, 120 n.19 (1982), and "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, 76 (2005).

In reviewing a § 2254 petition, a federal court is not permitted to address a federal

constitutional claim pertinent to the facts of the case unless the petitioner asserts the claim as a ground for relief.  That is, "errors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause."  Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d Cir. 1997).  In addition, "it is well established that a state court's misapplication of its own law does not generally raise a constitutional claim."  Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997) (citations and internal quotation marks omitted); see also Smith v. Zimmerman, 768 F.2d 69, 71, 73 (3d Cir. 1985).

In addition to the case law, the Antiterrorism and Effective Death Penalty Act ("AEDPA") limits a federal court's authority to grant habeas relief when a state court has adjudicated petitioner's federal claim on the merits.  See 28 U.S.C. § 2254(d).  Where a federal claim was "adjudicated on the merits" in state court proceedings, the writ must be denied unless adjudication of the claim either involved an unreasonable application of clearly established federal law, or was based on unreasonable determination of the facts in light of the evidence before the state court.  See 28 U.S.C. § 2254(d).

The unreasonableness standards of § 2254(d) govern only claims that were "adjudicated on the merits in State Court proceedings." 28 U.S.C. § 2254(d).  "An 'adjudication on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." Rompilla v. Horn, 355 F.3d 233, 247 (3d Cir. 2004) (citations and internal quotation marks omitted), reversed on other grounds sub nom. Rompilla v. Beard, 545 U.S. 374 (2005); see also Rolan v. Vaughn, 445 F. 3d 671, 678 (3d Cir. 2006).  A state court may render an adjudication on the merits

of a federal claim by rejecting the claim without any discussion whatsoever.  See Rompilla, 355 F.3d at 247.  On the other hand, "[i]f the petitioner's legal claims were presented but not addressed by the state courts, 28 U.S.C. § 2254(d) does not apply." Rolan, 445 F. 3d at 678.

If the New Jersey courts adjudicated the petitioner's claims on the merits, this Court may not grant relief unless either § 2254(d)(1) or § 2254(d)(2) is satisfied.  See 28 U.S.C. § 2254(d). Accordingly, this Court may not grant habeas relief to the petitioner unless the adjudication of a federal claim by the New Jersey courts involved an unreasonable application of clearly established Supreme Court law, see 28 U.S.C. § 2254(d)(1), or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding and Adamson is in custody in violation of the Constitution or laws or treaties of the United States.  See 28 U.S.C. § 2254(a), (d)(2).

When the grounds raised in the petition are governed by 28 U.S.C. § 2254(d)(1), the court must begin its analysis by determining the relevant law clearly established by the Supreme Court.  See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004).  Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision."  Williams, 529 U.S. at 412. A court must look for "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  Lockyer v. Andrade, 538 U.S. 63, 71, 72 (2003).

A decision is "contrary to" a Supreme Court holding within 28 U.S.C. §

2254(d)(1), if the state court "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Whether a state court's application of federal law is "unreasonable" must be judged objectively; an application may be incorrect, but still not unreasonable.[3] See id. at 409-10. "The unreasonable application test is an objective one - a federal court may not grant habeas relief merely because it concludes that the state court applied federal law erroneously or incorrectly." Thomas v. Varner, 428 F. 3d 491, 497 (3d Cir. 2005) (quoting Jacobs v. Horn, 395 F. 3d 92, 100 (3d Cir. 2005)).[4]

[3] See also Marshall v. Hendricks, 307 F.3d 36, 71 n.24 (3d Cir. 2002) ("[D]ecisions of federal courts below the level of the United States Supreme Court may be helpful to [a court] in ascertaining the reasonableness of state courts' application of clearly established United States Supreme Court precedent, as well as helpful amplifications of that precedent.") (citations and internal quotation marks omitted).

[4] There is an additional concern that Petitioner here may not have exhausted all aspects of the claims he raises in his § 2254 petition on direct appeal and appeal from denial of post-conviction relief prior to bringing the petition in federal court. It is a requirement of every § 2254 petition that federal constitutional claims be addressed on the merits in State court and fully exhausted prior to the filing of a habeas petition in federal court. See, e.g., Granberry v. Greer, 481 U.S. 129 (1987); Rose v. Lundy, 455 U.S. 509, 516-18 (1982); Ex parte Royall, 117 U.S. 241 (1886); Toulson v. Beyer, 987 F.2d 984, 987 (3d Cir. 1993). This means that the claims heard by the state courts must be the "substantial equivalent" of the claims asserted in the federal habeas petition, in other words, the legal theory and factual predicate must be materially the same. See Picard v. Connor, 404 U.S. 270, 275-77 (1971). This Court's examination of the record reveals that, in essence, the substance of Petitioner's claims was addressed on the merits at the State level. Therefore, to the extent that any of the more subtle nuances of the claims raised in the instant petition were not addressed in State court, this Court will nevertheless address all issues on the merits. See 28 U.S.C. § 2254(b)(2).

## II. Instant Instructions Challenge

### A. The Confrontation Clause Aspect

Ground One, the Instant Instructions Challenge, is subdivided into two aspects: (a) the Lack-of-Limiting-Instructions Aspect; and (b) the Confrontation Clause Aspect. The Lack-of-Limiting-Instructions Aspect poses two contentions: (a) the lack of a limiting instruction ("Actual Limiting Instruction Claim"); and (b) another contention, which, in fact, challenges the instructions given ("Given Instructions Claim").

The Confrontation Clause Aspect, in its own turn, in essence states that, contrary to the decision rendered by the Superior Court of New Jersey, Appellate Division, petitioner's case is factually and legally distinguishable from the precedent set in Tennessee v. Street. Petitioner further argues that he was prejudiced by the admission of co-defendants' confessions without the ability to confront them in court by way of cross-examination. The Court addresses all these arguments seriatim.

#### *1. The Instant Instructions Challenge*

Adamson asserts that when, "[d]uring cross-examination, the prosecutor questioned [Adamson] in detail about two . . . statements . . . given by Napier and Aljamaar, [Petitioner's Confrontation Clause rights were violated because Napier and Aljamaar's] statements indicated that [Adamson] planned and participated in the robbery, [but Adamson's trial counsel could not examine Napier and Aljamaar as to the truthfulness of these statements since] neither Napier [nor] Aljamaar testified at trial."[5]

[5] Although Adamson, Napier and Aljamaar were subject to the same indictment (which also involved other defendants), Adamson was tried separately, and neither of his co-defendants testified at his trial.

Id. On direct appeal, Adamson illustrated his Confrontation Clause challenge as follows:

> In response to the assistant prosecutor's recitation of the statements by Napier and Aljamaar, [Adamson] could not refute the content of the [Napier and Aljamaar's] statements. In regard to Napier's statement, for example, where [Napier] indicated that [Adamson] and others "talked about the robbery," [Adamson] could only respond "That's what [Napier] said in his statement."

State v. Adamson, A-2652-98T4, Brief and Appendix on Behalf of Defendant-Appellant, at 11-12, (filed Sep. 30, 1999).

In his direct-appellate papers, Adamson conceded that the prosecutor's reason for this line of questions was the prosecutor's goal to show that Adamson's testimony (that Cirelli directed him to produce a confession factually corresponding to Napier and Aljamaar's statements) was not credible, i.e. to suggest to the jurors that his confession, the key piece of evidence against Adamson, was produced by Adamson voluntarily and as Adamson saw fit. See id. at 12-14. In fact, Adamson even quoted, in his brief, the prosecutor's closing line to the jury, "when you compare the [confession given by Adamson and the statements given by Napier and Aljamaar], as I tried to do on cross-examination, ladies and gentlemen, [you would see that] there are inconsistencies." See id.

Adamson argued that the detailed content of Napier and Aljamaar's statements (which were conveyed to the jurors through this process of comparison) was unduly prejudicial to Adamson, since the jurors could potentially presume that the content of Napier and Aljamaar's statements was offered not for the purposes of impeaching his testimony but as factual evidence that Adamson was involved in the robbery. See id. Consequently, Adamson asserted that the very fact that the jurors came to know the details of Napier and Aljamaar's statements violated his rights under the Confrontation Clause. See id. (relying on state cases, one of which, in turn,

relied on the Supreme Court decision in Bruton v. United States, 391 U.S. 123 (1968), and Tennessee v. Street, 471 U.S. 409 (1985). See id. at 15-18.

The Appellate Division found Adamson's argument without merit and dismissed it, pursuant to the holding of Tennessee v. Street, reasoning as follows:

> [Adamson] maintains that the State's use of the Napier and Aljamaar statements violated the guarantees afforded by the Confrontation Clause of the Sixth Amendment as applied in Bruton . . . . We disagree. An accomplice's out-of-court statement may be used for "a purpose other than proving the truth of what it asserts without violating a defendant's right of confrontation." In Tennessee v. Street, the introduction of an accomplice's statement was permitted to show that it was different from defendant's statement where defendant testified that the Sheriff had read the accomplice[']s statement and directed defendant to say the same thing.
>
> Here, the facts are not only similar to those in Street but even more compelling. [Adamson] testified that . . . Cirelli provided him with the two other statements whereupon they sat down at the computer, and Cirelli proceeded to provide both the questions and the answers. When the State cross-examined [Adamson] to show that some of the facts in his statement were different than those recounted in the other two statements, [Adamson] testified that Cirelli directed him to change the facts to further implicate his accomplices. [Adamson] opened the door for the use of [Napier and Aljamaar's] statements by his direct testimony that Cirelli utilized them as the basis for contriving [Adamson's] confession. His testimony that Cirelli directed him to diverge from the[se] statements justified further use of the contents of the statements to impeach [Adamson's] assertion that the purported confession was not his. Thus, as in Street, the fundamental truth seeking function of the criminal trial process would have been impeded if the State was prevented from the accomplices' statements to assist the jury in determining the truth of [Adamson's] assertion that the confession was not his but one contrived by [D]etective Cirelli. Tennessee v. Street, 471 U.S. at 415.

State v. Adamson, A-2652-98T4, at 10-12 (N.J. Super. Ct. App. Div. Oct. 5, 2000) (citations to state law omitted), certif. denied, 167 N.J. 90, cert. denied, 532 U.S. 1072 (2001).

Adamson has essentially raised the same argument here as on appeal. In support of his petition, Adamson maintains that his direct testimony alleging that Cirelli "provided [Adamson]

with [Napier and Aljamaar's] statements [the police] had and [Cirelli] told [Adamson] to read them and make [Adamson's confession]" should have been ignored by the prosecutor, as inconsequential as to the relationship between his confession and Napier and Aljamaar's statements.  Docket Entry No. 1-5 at 11.  Adamson concludes that, when viewed in context, the answers he provided on direct examination had to be understood by the prosecutor as meaning that Cirelli produced Adamson's confession wholesale, and thus, the prosecutor acted unreasonably when he went on to compare the content of his confession to that of Napier and Aljamaar's statements on cross-examination.  See Docket Entry No. 6, at 6; Docket Entry No. 1-5 at 11-12.  Therefore, Adamson asserts that his Confrontation Clause rights were violated by the prosecutorial detailed discussion of the content of Napier and Aljamaar's statements.  See id.

Adamson also argues that the Appellate Division's analysis of Adamson's claim under Street was in error.  See Docket Entry No. 1-5 at 13-14 (the Appellate Division "failed to recognize" that Adamson's case was different from Street and that reliance on Street was an unreasonable application of this Supreme Court's precedent).  Consequently, Adamson concludes that his conviction should be reversed, since: (a) under the Confrontation Clause, the content of Napier and Aljamaar's statements should not have ever been revealed to the jury, and (b) the disclosure of the content of Napier and Aljamaar's statements was the key reason for Adamson's conviction.  See Docket Entry No. 1-5 at 9.

The Court disagrees with Adamson that the prosecutor acted unreasonably in attempting to impeach Adamson's credibility by using his co-defendants' statements.  Adamson challenges the prosecutor's actions by asserting that the prosecutors's construction of Adamson's direct testimony was unreasonable and, thus the further verification and impeachment were

unwarranted.  In support of his claim that the prosecutor unreasonably construed his direct

testimony, Adamson maintains that the ten answers that he provided on direct examination must

be read as unambiguously indicating that it was Cirelli who fabricated his confession, wholesale.

See Docket Entry No. 6, at 4-6.

These ten direct-examination questions and answers were as follows:

Q.    Did there come a point in time where . . . Cirelli[] came in to talk to you?
A.    Yes, sir.
Q.    And did [Cirelli] raise the – any questions about your girl friend?
A.    Yes.
Q.    And what did he say?
A.    [Cirelli] told me that they was going to charge my girl friend if I didn't make a [confession].  So, then, he provided me with two other statements they had [from Napier and Aljamaar,] and he told me [to] read them and make a [confession].  So, [Cirelli and I] sat down at the computer and started typing up a [confession].
Q.    Now, [Cirelli] said that he would give you the question and then he would type in your answer.  Did you give him those answers?
A.    No, I didn't.
Q.    Okay.  When the [confession] was finished, was it signed by you?
A.    Yes, it was.
Q.    And on the side of the [confession] there's initials?
A.    Yes.
Q.    H.A.?
A.    Yes.
Q.    By each answer?
A.    Yes.
Q.    Did you put those on there?
A.    Yes.
Q.    Did you in fact read [your confession]?
A.    No.

Id.

Read in context, the answers elicited on direct examination develop a meaning opposite

of that argued by Adamson in his petition.  It suggests that Adamson's confession was produced

by Adamson upon Cirelli's directive to make a statement factually corresponding to the

statements made by Napier and Aljamaar.  Consequently, and contrary to Adamson's contention,

it was not unreasonable for the prosecutor to construe his direct testimony as asserting such a position and, thus, it was not unreasonable for the prosecutor to proceed with questions aiming to establish Adamson's lack of credibility.

It shall be noted that, during the cross-examination, Adamson kept giving occasional responses that could be construed as suggesting that Cirelli produced Adamson's confession wholesale.  However, these responses came in a package with a multitude of other statements by Adamson verifying that Adamson produced the confession in concert with Cirelli.  For instance, the part of the cross-examination as to the Process-Ineffectiveness Aspect resulted in the following testimony:

> Q.      *Isn't it a fact that during those two hours you were giving him the answers to the questions he asked?*
>
> A.      He was stopping also.
>
> Q.      He was stopping to read your answer?
>
> A.      No, stopping, *giving me the questions, let me read it and giving the answers from the statement.*
>
> Q.      Wouldn't it be easier, though if  [Cirelli] wanted to fabricate your statement if he made up his own questions and answers?
>
> A.      Basically [Cirelli] could have [done] that.
>
> Q.      *It's your testimony [that Cirelli] didn't do that?*
>
> A.      *He did it in my statement.*

State v. Adamson, A-2652-98T4, at 9-10 (N.J. Super. Ct. App. Div. Oct. 5, 2000) (replicating the relevant portion of the transcript).

As this excerpt illustrates, Adamson's first answer provided the prosecutor with a response indicating that Cirelli could have but, in fact, did not "make up" Adamson answers, but

Adamson's second response could be interpreted as stating a direct opposite.

The overall theme of Adamson's testimony suggested that Adamson falsified his confession upon Cirelli's directive to produce a statement corresponding to those made by Napier or Aljamaar.  In sum, Adamson's testimony conveys the opposite of what he contends– that Cirelli completely fabricated Adamson's confession on his own– and instead creates the impression that Cirelli directed him to produce a confession factually corresponding to Napier and Aljamaar's statements.  Even if the actual circumstances surrounding Adamson's execution of his confession consisted of this surrealistic scenario, a reasonable person in the prosecutor's shoes would have been justified in harmonizing Adamson's testimony into a position infinitely more pronounced, i.e., that the confession was a product of Cirelli's order to state the same thing as was stated by Napier and Aljamaar.[6]

---

[6]  While, in light of the Court's § 2254 mandate to determine reasonableness of the state courts' decision under the applicable Supreme Court precedent, this Court concentrated on the excerpts from Adamson's testimony expressly highlighted in the Appellate Division's decision, the Court finds the following excerpt (not replicated in State v. Adamson, A-2652-98T4, at 9-10 (N.J. Super. Ct. App. Div. Oct. 5, 2000)) quite illustrative of Adamson's position:

> Q.      Now, you said during your direct testimony that you were given two other statements to read prior to giving [your confession].  Is that right?
> A.      Yes.
> Q.      And that's your testimony. *That's how you knew these details [as to the crime committed].  Is that what you are trying to tell us?*
> A.      *Yes.*
> Q.      Whose other statement specifically was it that you were given?
> A.      Aljaamar and Darren Napier['s].

State v. Adamson, Transcript 6T at 88-89.

It is clear from this excerpt that Adamson indicates that Cirelli directed him to produce his confession based upon Napier and Aljamaar's statements rather than on the basis of Cirelli's dictations (or other prompts) of Adamson's answers.

Consequently, the Court finds that the prosecutor reasonably impeached Adamson by comparing his confession and the statements executed by Napier and Aljamaar. Therefore, the only question left here is whether such comparison, nonetheless, violated Adamson's Confrontations Clause rights. The substantial factual and legal similarity between this question and the state courts' inquiry conducted during Adamson's direct appeal leads this Court to conclude that this sole remaining question is indistinguishable from Adamson's Street Claim, as set forth below.

### 2. *The Street Claim*

#### a. Confrontation Clause Guarantees

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. This guarantee applies to both federal and state prosecutions. See Pointer v. Texas, 380 U.S. 400 (1965).

In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court held that the Sixth Amendment's Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant has had a prior opportunity for cross-examination." Id. at 53-54; see also Davis v. Washington, 547 U.S. 813 (2006).

However, under the law in effect at the time of Adamson's crime and conviction, the Supreme Court had held that the Confrontation Clause did not bar admission of testimonial hearsay against a criminal defendant if the statement had adequate indicia of reliability, i.e., fell within a "firmly rooted hearsay exception" or bore "particularized guarantees of

trustworthiness."[7] Ohio v. Roberts, 448 U.S. 56, 66 (1980). Therefore, in light of the fact that hearsay is defined as an out-of-court statement that is offered into evidence to prove the truth of the matter asserted, see, e.g., N.J.R.E. 801(c), the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Crawford, 541 U.S. at 59 n.9 (citing Tennessee v. Street, 471 U.S. 409); accord United States v. Inadi, 475 U.S. 387 (1986) (clarifying that out-of-court statements offered into evidence for a reason other than to prove the truth of the matter asserted cannot, by definition, be qualified as hearsay and, thus, do not even trigger the hearsay analysis regardless of any resemblance these statements might have with actual hearsay statements that would require such analysis but would nonetheless be admissible as a result of workings of certain rules of evidence setting forth exceptions to the hearsay bar).

b. The Decisions of the State Courts Were Reasonable Applications of Supreme Court Precedent

Adamson next argues that these allegations are marked by an attempt to state that the prosecutor reasonably engaged in comparison of Adamson's confession to Napier and Aljamaar's statements but the nature of the comparison in the case at bar differs from that addressed in Street and, hence, *under the holding of Street*, Adamson's conviction must be reversed. See generally, Docket Entry No. 1-5, at 11-16. Adamson's arguments can be summarized by the following two contentions:

---

7 In Idaho v. Wright, 497 U.S. 805, 818-20 (1990), the Supreme Court determined that in order to show "particularized guarantees of trustworthiness" the court must examine the relevant circumstances, i.e., those circumstances that surround the making of the statement which render the declarant worthy of belief and admit the out-of-court evidence upon determination that the test of cross-examination would be of marginal utility.

1. "While the . . . prosecutor [aimed] to show inconsistencies between [Napier and Aljamaar's] statements and Adamson's [confession,] the real effect of [the prosecutor's] cross-examination of Adamson was highlighting passages of [Napier and Aljamaar's] statements that implicated him in the robbery. . . . Furthermore, the . . . inconsistencies between Adamson's [confession] and [Napier and Aljamaar's] statements were trivial . . . . The overwhelming thrust of [Napier and Aljamaar's] statements did not pertain to [these inconsistencies], but to Adamson's participation in the robbery. Street, on the other hand, only involved one co-defendant's statement that was markedly different than [defendant's confession]. . . . Street does not allow the use of such devastatingly prejudicial hearsay without independent corroboration of something unique in the defendant's statement which is not found in a non-testifying co-defendant's statement."

Id. at 11, 16-17 ("Prejudice-Based Contention").

2. "[I]n Street, unlike the case at bar, co-defendant['s] statement was read by a rebuttal witness . . . who personally obtained that statement and denied that Street was pressured to duplicate [the co-defendant's] statement. . . . Here, on the other hand, the . . . prosecutor cross-examined [Adamson] about the details of [Napier and Aljamaar's] hearsay statements. The Appellate Division panel failed to recognize that Adamson, in contrast . . . , could not refute the content of those statements . . . ."

Id. at 13-14 ("Affiant-Based Contention").

Both of these Contentions are without merit.

i. The Prejudice-Based Contention

The bulk of Adamson's Prejudice-Based Contention is improperly before this Court. The issue of whether a certain piece of evidence admitted during the trial proceeding was prejudicial to defendant implicates the procedural due process guarantees of the Fourteenth Amendment, rather than the Confrontation Clause of the Sixth Amendment.

Because Adamson failed to articulate the proper legal basis supporting his Prejudice-Based Contention by erroneously qualifying the aspect as a Sixth Amendment challenge, this argument may not be properly considered as part of Adamson's petition. A habeas corpus petition must meet "heightened pleading requirements." McFarland v. Scott, 512 U.S. 849, 856

(1994) (citing 28 U.S.C. § 2254, Rule 2(c)). That means the petition must "*specify all the grounds for relief* which are available to the petitioner," and set forth "the facts supporting each of the *grounds thus specified*." See Rule 2(c) of the Rules Governing Section 2254 Cases. These "heightened pleading requirements" apply even to pro se applicants having no legal training. See McFarland, 512 U.S. at 856. As Adamson is represented by counsel, no less stringent standard should apply to him.

Here, the mere usage of the word "prejudicial" in Adamson's Prejudice-Based Contention is insufficient to meet the pleading standard required by law. The Supreme Court expressly cautioned: "If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so." Duncan v. Henry, 513 U.S. 364, 366 (1995) (holding that a claim of "miscarriage of justice" does not qualify as a federal constitutional claim). Relying on Duncan v. Henry, the Third Circuit clarified, in Keller v. Larkins, 251 F.3d 408, 413-415 (3d Cir. 2001), that denial of a claim asserting lack of "fair trial" is proper because such claim does not state a federal constitutional violation:

> [A petitioner does] not invoke the federal due process guarantee [if the petitioner merely] claim[s] that admission of the evidence produced a "miscarriage of justice" [or] argues that the [trial process] denied him a "fair trial." Since the Supreme Court found the former language insufficient to give fair notice of a federal due process claim, we are hesitant to attach greater significance to the passing reference to the concept of a "fair trial" on which [the petitioner's] argument rests.

Keller, 251 F.3d at 415. Consequently, Adamson's Fourteenth Amendment due process aspect of the Prejudice-Based Contention is subject to dismissal for failure to exhaust state remedies and

*also* for failure to state a federal claim.  However, the Court will nevertheless consider the argument on its merits. See supra note 4.

In that regard, had Adamson's Fourteenth Amendment due process aspect of the Prejudice-Based Contention been articulated in the Petition, it still would not help to his cause. The Supreme Court has emphasized that "the Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983).  In Estelle v. McGuire, 502 U.S. 62 (1991), the Supreme Court held that the state court's admission in petitioner's trial for murdering his infant daughter of the testimony of two physicians that the child had suffered child abuse did not violate due process because the evidence was relevant.  "[N]othing in the Due Process Clause of the Fourteenth Amendment requires the State to refrain from introducing relevant evidence." Id. at 70.  While the United States Court of Appeals for the Third Circuit has held that the admission of evidence may violate due process where the evidence "undermine[d] the fundamental fairness of the entire trial," Keller, 251 F. 3d at 413; see also Lesko v. Owens, 881 F. 2d 44, 51 (3d Cir. 1989) ("the erroneous admission of evidence that is relevant, but excessively inflammatory, might rise to the level of a constitutional violation"); Bisaccia v. Att'y Gen., 623 F. 2d 307, 313 (3d Cir. 1980) (when "the probative value of . . . evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission, then use of such evidence by a state may rise to the posture of fundamental fairness and due process of law"), this Court is not aware of any Supreme Court case establishing that the general admission of admissible but prejudicial evidence necessarily constitutes a violation of federal constitutional rights. See Estelle, 502 U.S. at 70.  Consequently, even if the due process claim had been properly pled in Adamson's

petition, the state courts' decision to affirm his conviction would not violate an established Supreme Court precedent.  Thus, Adamson's claim would, in any event, be dismissed.

If the due process implications are removed from Adamson's Prejudice-Based Contention, little is left to be resolved in that Contention under the Confrontation Clause of the Sixth Amendment.

The sole relevant sentence that the Court could detect to that effect reads, "[unlike the case at bar,] Street . . . involved *only one* co-defendant's statement that was *markedly different* [from defendant's confession]."  Docket Entry No. 1-5, at 16 (emphasis added).  The Supreme Court in Street articulated a holding to the contrary.  The Street Court clarified that, in the scenario examined by the Court, "[co-defendant's] statement was generally consistent with [defendant's] confession, [but] there were *some* differences." Tennessee v. Street, 471 U.S. at 412 and n. 3 (listing the total of three distinctions, which the Court qualified as "details").  The Court then proceeded to observe that,

> In this case, . . . the prosecutor did not introduce [the co-defendant's] out-of-court [statement] to prove the truth of [the co-defendant's] assertions.  [Hence, the co-defendant's statement] was not hearsay under traditional rules of evidence. . . . [This] nonhearsay aspect of [the co-defendant's statement] -- not to prove what happened at the [crime] scene but to prove what happened when [defendant] confessed -- raises no Confrontation Clause concerns.

Id. at 414 (the holding of Street).

Here, just as in Street, Napier and Aljamaar's statements were "generally consistent" with Adamson's confession, but "there were *some* differences."  Street, 471 U.S. at 412 and n.3. Indeed, no statement made in Street suggests that the differences between the co-defendant's statement and defendant's confession have to be so dramatic as to render the documents "markedly different" factually.  See generally id.  Therefore, under the holding of Street,

prosecutor was indeed entitled to intimate the jury, in great detail, with the content of Napier and Aljamaar's statements to establish this fact.

Moreover, the fact that Street involved an evaluation of a single statement made by one co-defendant in no way renders its holding inapplicable to cases where the prosecutor is faced with multiple statements made by multiple co-defendants.

Therefore, with respect to Adamson's Prejudice-Based Contention, this Court finds that the state courts' decisions to affirm Adamson's conviction were not an unreasonable application of the Supreme Court precedent set forth in Tennessee v. Street.

ii. The Affiant-Based Contention

Adamson's Affiant-Based Contention asserts that, since the content of Napier and Aljamaar's statements was revealed to the jurors during his cross-examination, rather than during Cirelli's testimony, the very status of the testifying person, that is, the status of Adamson as defendant versus the status of Cirelli as witness, mandates reversal of Adamson's conviction under the holding of Street. In support of this Contention, Adamson quotes the following excerpt from Street:

> The *nonhearsay* aspect of [defendant's] confession -- not to prove what happened at the murder scene but to prove what happened when respondent confessed -- raises no Confrontation Clause concerns. The [Confrontation] Clause's fundamental role in protecting the right of cross-examination was satisfied by [the] Sheriff['s] presence on the stand. If respondent's counsel doubted that [defendant's] confession was accurately recounted, he was free to cross-examine the Sheriff. By cross-examination respondent's counsel could also challenge [the] Sheriff['s] testimony that he did not read from [defendant's] statement and direct respondent to say the same thing. In short, the State's rebuttal witness against respondent was not [defendant], but [the] Sheriff . . . .

Tennessee v. Street, 471 U.S. at 414 (emphasis in original, citation omitted); accord Docket Entry No. 1-5, at 13 (replicating the excerpt).

Adamson selects the phrase "was satisfied by [the] presence [of the law enforcement officer] on the stand," and interprets his selection as necessarily mandating that the information about the content of the co-defendant's statement comes from the testifying law enforcement officer. The Court disagrees. The Supreme Court in Street specifically recognized that the existence of alternative means of presenting the evidence does not make these alternative means "the only option constitutionally open." Street, 471 U.S. at 416.

Adamson overlooks the key point of the Supreme Court's finding, i.e., that the Confrontation Clause guarantees are satisfied by the *ability* of defendant to examine the law enforcement officer (rather than by having the information coming out of the law enforcement's officer's mouth). See Street, 471 U.S. at 414.

Here, Cirelli was not only available for such examination during Adamson's trial, but he did, in fact, testify and was cross-examined by Adamson's defense attorney. See State v. Adamson, Transcript 6T at 61-64. While Adamson's defense attorney, same as the defense counsel in Street, did not question Cirelli as to the process of execution of Adamson's confession, a defendant's own decision not to utilize his/her opportunity to question a certain witness cannot trigger the Confrontation Clause. Had Adamson's defense attorney wished to cross-examine Cirelli on the issue of how Adamson's confession was produced, he had a full and unfettered opportunity to do so. See Street, 471 U.S. at 414. Moreover, even if this Court were to hypothesize an unlikely scenario where Adamson's claim of falsification was first articulated by Adamson only when he took the stand and, hence, came as a complete surprise even to Adamson's defense counsel, the defense counsel was certainly free to call Cirelli to the stand as

Adamson's witness, [8] and examine Cirelli as to the process of execution of Adamson's confession in order to rebut the prosecutor's point that the confession was true.

The Court finds that the state courts correctly recognized that the Confrontation Clause protections elaborated upon by the Supreme Court in Street were duly present during Adamson's trial and, therefore, concludes that the state courts affirmance of Adamson's conviction under the holding of Tennessee v. Street was not an unreasonable application of the Supreme Court precedent.

Consequently, the Court will dismiss the entire Confrontation Clause Aspect of the Instant Instructions Challenge.

**B. The Lack-of-Limiting-Instructions Aspect**

**1. *The Actual Limiting Instruction Claim***

On direct appeal, Adamson argued "that the trial judge's failure to give the jury a limiting instruction concerning the use of [Napier and Aljamaar's] statements constituted plain error." State v. Adamson, A-2652-98T4, at 12 (N.J. Super. Ct. App. Div. Oct. 5, 2000). The Appellate Division, however, disagreed, reasoning as follows:

> While we agree that a limiting instruction should have been given, we nevertheless conclude its omission did not constitute plain error. When evidence is admissible for one purpose and not admissible for another, the party opposing the evidence has the burden to request a limiting instruction. A criminal defendant is not in a favorable position to argue on appeal that the trial judge failed to give a curative instruction where such instruction was not requested when the error occurred. This is especially true when [the state rules of evidence] permit[] waiver of right to a limiting instruction.
>
> [Moreover, even factoring out the aspect that] no request [for limiting instruction] was made by [Adamson's counsel during Adamson's trial,] we are . . . satisfied that there was no plain error. Here[,] the failure to give a limiting instruction did

[8] Adamson testified right after Cirelli, during the same day. See State v. Adamson, Transcript 6T at 41-108 (replicating these back-to-back testimonies).

> not have a clear capacity to produce an unjust result. Our review of the record leads us to the conclusion, beyond a reasonable doubt, that the error did not lead the jury to a result it otherwise might not have reached. . . . The record is more than adequate to support a determination on the part of the jury that the defense raised by [Adamson] was simply not credible. We are satisfied, from our review of the jury charge, that the trial judge gave a detailed and adequate instruction which provided the jury with a clear and accurate guide to assessing the credibility of defendant, the witnesses, and their testimony concerning the statements involved. We find no plain error . . . .

Id. at 12-13 (citations omitted).

Adamson, however, asserts that this finding was in error. He points to five Supreme Court precedents, arguing that the presence of a limiting instruction is essential to the constitutionality of a Street-type submission of evidence. Docket Entry No. 1-5, at 17-18 (emphasis deleted). Adamsom's argument is without merit.

This Court's § 2254(d)(1) mandate allows the Court to grant habeas relief only with respect to a claim so adjudicated by the state court that the state decision contradicts a clearly established Supreme Court precedent. See 28 U.S.C. § 2254(d)(1); Yarborough, 541 U.S. at 660. Because federal courts do not hold appellate authority over state judicial proceedings, and "may intervene only to correct wrongs of constitutional dimension," Smith v. Phillips, 455 U.S. 209, 221 (1982), in order to satisfy the mandates of § 2254(d)(1), the state court decision must be contrary the *express holding of a relevant* Supreme Court precedent. See Williams, 529 U.S. at 405. Hence, it is not sufficient to merely assert that a certain remote inference might be drawn from "a" Supreme Court precedent, rather, the litigant must demonstrate that the *relevant* Supreme Court precedent requires, through its holding, an outcome contrary to that reached by the state courts. See Outten v. Kearney, 464 F.3d 401, 413 (3d Cir. 2006). Section 2254 does not recognize arguments based on factually and legally different Supreme Court cases, even if the

litigant believes that such different cases might be read as somewhat "analogous" to the litigant's action.

Here, Adamson's citations are inapposite to the Actual Limiting Instruction Claim because none of those cases involve, as here, an issue of alleged plain error where a limiting instruction was neither requested by the defendant nor given sua sponte by the trial court. See Gray v. Maryland, 523 U.S.185, 191 (1998); Sullivan v. Louisiana, 508 U.S. 275, 281-82 (1993); Street, 471 U.S. at 412; Francis v. Franklin, 471 U.S. 307, 318 (1985); Connecticut v. Johnson, 460 U.S. 73, 87-88 (1983).

Further, it is well-established that inquiry as to whether a certain piece of evidence was correctly admitted during state proceedings plays, generally, "no part [in] a federal court's habeas review of a state conviction," Estelle, 502 U.S. at 67. Federal courts, recognizing a strong interest in finality of judgments, rarely reverse a criminal conviction based upon an improper jury instruction. See Henderson v. Kibbe, 431 U.S. 145, 154 (1977); see also Namet v. United States, 373 U.S. 179, 190 (1963). Since the district courts' mandate is only to correct errors of constitutional magnitude, a determination of whether the error amounts to such a violation "requires a comparison of the instructions which were actually given with those that should have been given." Henderson, 431 U.S. at 154. The court, while conducting such comparison, should factor into its analysis a consideration of whether the defendant actually requested the instructions that the defendant claims should have been given. "It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." Id.

Here, there is no dispute that Adamson's trial counsel did not request the limiting instruction which he now characterizes as the one needed to ensure that "the fact that the jury should not have considered [Napier and Aljamaar's] statements for the truth of the matter asserted would [not] be lost on a lay juror." Docket Entry No. 1-5, at 28. Similarly, there is no dispute that Adamson's trial judge provided the jury with detailed and adequate instructions as to all pertinent propositions related to the substantive law involved and the basic rules of evidence. See generally, State v. Adamson, A-2652-98T4, at 3-68 (Transcript 7T). Adamson's point, therefore, qualifies solely as a claim that it would be desirable for the trial judge to drive home the non-hearsay purpose of prosecutorial examination further, i.e., that the instructions could have been better. However, the fact that the instructions could have been better does not render them unconstitutional. This is exactly the conclusion reached by the state courts. See State v. Adamson, A-2652-98T4, at 12 (N.J. Super. Ct. App. Div. Oct. 5, 2000). Therefore, the Court cannot find that the state courts' decision to affirm Adamson's conviction was an unreasonable application of the relevant Supreme Court precedent.

**2. *The Given Instructions Claim***

In order to show that the state courts' decision was an unreasonable application of the Supreme Court precedent, Adamson also argues the instructions actually given provided the jurors with expressly erroneous guidance as to the trial court's purpose for admission of Napier and Aljamaar's statements. Specifically, Adamson asserted that, "rather than limiting the considerations of [Napier and Aljamaar's] statements, [Adamson's trial judge] improperly told the jurors to consider those statements [for hearsay purposes.]" Docket Entry No. 1-5, at 18-19. In support of this claim Adamson quotes the following excerpt from the instructions:

> You will, of course, consider other evidence and inferences from the evidence including statements of other witnesses or acts of the witness and others disclosing other motives that the witness may have had to testify as he did, that is, reasons other than which he gave us.

Id. at 18.

Adamson concludes that the judge's usage of the phrase "statements of other witnesses" must necessarily be interpreted as the judge's reference to Napier and Aljamaar's statements, which--according to Adamson--signified the judge's instruction to the jurors to consider Napier and Aljamaar's statements for the truth of the matter asserted. Id. at 19 (alleging that the *only* "statements of other witnesses" were Napier and Aljamaar's statements). However, in the context of the entire jury instruction at hand, it appears that the trial judge referred to the testimonial statements of those who took the stand during the trial (e.g., the victims of the robbery or the police officials) when the judge directed the jurors to consider "statements of other witnesses"; specifically, it appears that the judge invited the jurors to determine credibility of Adamson and Cirelli's testimonies (i.e., Adamson's testimony that his confession was coerced and Cirelli's testimony that Adamson's confession was voluntary and produced by Adamson as Adamson saw fit).[9] Indeed, it would be wholly unreasonable for a lay person—much less a

[9] Adamson's trial judge instructed the jurors as follows:

> What is credibility? And of course, that's essential to any case. Credibility is defined as worthiness of belief. It is that quality in a witness which renders his or her evidence worthy of belief. And you will note that I have used the phrase credible evidence. Evidence to be believed must not only proceed from the mouth of a credible witness but it also must be credible in itself. It must be such as the common experience and observation of mankind can approve as probable under the circumstances. Evidence has been presented showing that at a prior time a witness may have said something . . . that is inconsistent with that witness' testimony during trial. . . . However, before deciding whether the prior inconsistent . . . statement reflects the truth, in all fairness you will want to consider all of the circumstances under which this statement . . . occurred. . . . The extent to which such alleged inconsistencies . . . reflect the truth is for you to determine. Consider their

professional jurist--to understand the judge's instructions as a directive to perceive Napier and Aljamaar as trial "witnesses" and to consider the content of the *documents* they executed once upon a time as "statements" made during the trial proceedings.

> It is well established that the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. In addition, in reviewing an ambiguous instruction . . . , [the court must] inquire whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.  And [the court must] also bear in mind [that the courts] defined the category of infractions that violate 'fundamental fairness' very narrowly.  Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.

Estelle, 502 U.S. at 72-73 (quotation marks and citations and omitted).  Under the standard set forth in Estelle, this Court cannot find that the instructions given by the trial judge and directing the jury to consider "statements of other witnesses" so infected the entire trial as to cause the jurors to commit an error of constitutional magnitude and, thus, to violate Adamson's due process rights.   Accord State v. Adamson, A-2652-98T4, at 13 (N.J. Super. Ct. App. Div. Oct. 5, 2000) (the record provides support for the conclusion that Adamson's conviction merely reflected jury's determination that "the defense raised by [Adamson] was simply not credible").  Consequently, the state courts' decision to affirm Adamson's conviction was not an unreasonable application of the Supreme Court precedent.  This Court, therefore, will dismiss the Lack-of-Limiting-

---

> materiality, if any, and relationship to the entire testimony and all the evidence in the case, when, where and the circumstances under which they were said . . . and whether the reasons given you therefore appear to be believable and logical.  In short, consider all that I have told you about prior inconsistent statements. You will, of course, consider other evidence and inferences from the evidence including statements of other witnesses or acts of the witness and others disclosing other motives that the witness may have had to testify as he did, that is, reasons other than which he gave us.

State v. Adamson, A-2652-98T4, 7T (transcript of the jury charge).

Instructions Aspect for failure to show a violation of Adamson's federal rights and, being presented with no other arguments, will dismiss the Instant Instructions Challenge in its entirety.

## IV. Adamson's Sentencing Challenge

Adamson also challenges the legality of his sentence, claiming that it violates the principles enunciated by the Supreme Court in Apprendi v. New Jersey, 530 U.S. 466 (2000).

### A. Legal Regime Implicated by Adamson's Sentencing Challenge

"[No] federal tribunal has any authority to place a construction on a state statute different from the one rendered by the highest court of the state." Johnson v. Fankell, 520 U.S. 911, 916 (1997); see also Mullaney v. Wilbur, 421 U.S. 684, 691 (1975). However, the highest state court's determination whether a statute, as construed, complies with the federal constitution is not immune from federal review; this applies, inter alia, to state sentencing regimes.

Modern sentencing law has been reformulated due to a wave of federal and state sentencing cases that have been decided over the past nine years.

> In Apprendi v. New Jersey, [the Supreme] Court held that, under the Sixth Amendment, any fact (other than a prior conviction) that exposes a defendant to a sentence in excess of the relevant statutory maximum must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence. See 530 U.S. 466, 490. The Court has applied the rule of Apprendi to facts subjecting a defendant to the death penalty [in] Ring v. Arizona, 536 U.S. 584, 602 [(2002)], facts permitting a sentence in excess of the "standard range" under [a state sentencing regime in] Blakely v. Washington, 542 U.S. 296, 304-305 [(2004)], and facts triggering a sentence range elevation under the then-mandatory [federal sentencing regime in] United States v. Booker, 543 U.S. 220, 243-244 [(2005)].

Cunningham v. California, 549 U.S. 270, 127 S. Ct. 856, 857 (2007) (continuing the Apprendi-Booker line of cases).

The difference between Apprendi and Blakely is as follows: in Apprendi, the Supreme Court found that New Jersey's "hate crime" law violated the Due Process Clause of the Fourteenth Amendment, and the notice and jury trial guarantees of the Sixth Amendment, because it allowed a judge to find facts by a lower standard of proof than would be required of a jury and to increase a defendant's sentence beyond the "statutory maximum" for that particular crime. The Court thus held that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 525.

Four years later, in Blakely, the Supreme Court clarified what "statutory maximum" means for the purposes of Apprendi-based analysis. See Blakely, 542 U.S. 296. It means the highest possible sentence a judge may impose "solely on the basis of the facts reflected in the jury verdict or admitted by the defendant," i.e., that the "statutory maximum" is the maximum sentence a judge may impose without finding any additional facts, that is, except by taking notice of prior convictions. See id. at 301, 303. The next term, the Court held, in Booker, that the rationale of Blakely applied to the federal sentencing regime. The case law following these decisions invariably established that the holdings of the Apprendi-Cunningham line of cases had no retroactive application. See Tyler v. Cain, 533 U.S. 656 (2001); Lloyd v. United States, 407 F.3d 608 (3d Cir. 2005); In re Olopade, 403 F.3d 159 (3d Cir. 2005); United States v. Swinton, 333 F.3d 481, 491 (3d Cir. 2003); United States v. Jenkins, 333 F.3d 151, 154 (3d Cir. 2003); In re Turner, 267 F.3d 225 (3d Cir. 2001).

Seven months after issuance of Booker, the Supreme Court of New Jersey decided a trilogy of cases applying the principles that were formulated by the Supreme Court from

Apprendi to Booker. See State v. Franklin, 184 N.J. 516 (2005); State v. Abdullah, 184 N.J. 497 (2005); State v. Natale, 184 N.J. 458 (2005). In Natale, the Supreme Court of New Jersey eliminated the presumptive term from New Jersey's sentencing process, holding that, since the presumptive term was the "statutory maximum" for the purposes of Blakely, a sentence above that term based solely on a judicial fact-finding of aggravating factors, other than recidivism, would violate the Sixth Amendment. See Natale, 184 N.J. at 466.

Much like the case law establishing lack of retroactivity of the Apprendi-Cunningham holdings, the Supreme Court of New Jersey declined to make Natale fully retroactive. The court recognized that "[f]ull retroactivity would overwhelm our courts with resentencings and impose a devastating burden on the judiciary," and elected to apply the Natale rule "retroactively [only] to cases in the pipeline [i.e.,] to defendants with cases on direct appeal as of the date of [the Natale] decision and to those defendants who raised Blakely claims at trial or on direct appeal." Id. at 494.

Consequently, for Adamson's purposes, the retroactivity announced in Natale was of no impact, since his direct appeal was completed long before Natale and Blakely were decided.

**B. Genesis of Adamson's Sentencing Challenge**

On direct appeal, Adamson did not raise any issue based on Apprendi or any of its progeny, though Apprendi was decided while Adamson was still litigating his conviction and sentence. The very first time that a challenge based on a case from the Apprendi-Booker string of decision was raised by Adamson was during his post-conviction proceedings, i.e., when--seven months after the Supreme Court's ruling in Blakely– Adamson filed an appeal with respect to denial of his first petition for post-conviction relief arguing, inter alia, Adamson's Sentencing

Challenge. See State v. Adamson, A-5921-03T4, Brief and Appendix on Behalf of Defendant-Appellant (filed on Jan. 28, 2005).

Adamson's Sentencing Challenge was based expressly on the holding of Blakely. His legal argument involved a detailed review of Blakely and its progeny in New Jersey courts. See id. Specifically, Adamson urged the state courts to *follow* Natale, a decision the gist of which Adamson read as favorable to his cause, and *not to follow* the holding of State v. Abdullah, 184 N.J. 497, the decision which Adamson read as adverse to his interests. See id. at 39-41 (explaining his position that, in Abdullah, the New Jersey Supreme Court reached an unnecessarily broad conclusion when it arrived at the umbrella holding that a judicial finding of aggravating factors falls within the "prior conviction" exception to the Apprendi rule). Aside from his discussion of the allegedly unduly sweeping reach of Abdullah, Adamson did not discuss any Apprendi aspect: Apprendi appeared in Adamson's brief only twice, both times as part of a massive block-quotation from Blakely. See id. at 33.

The Appellate Division, concentrating on the limited retroactivity aspect of Natale, which was left unaddressed, affirmed the trial court's decision as to Adamson's sentence. See State v. Adamson, A-5921-03T4 (filed on Nov. 1, 2005). Dedicating merely a short paragraph to this issue, the Appellate Division observed:

> [W]e address [Adamson's] contention that [his] sentence violates the constitutional considerations announced in Blakely v. Washington, 542 U.S. 296 (2004). While this appeal was pending, our Supreme Court decided State v. Natale, 184 N.J. [at] 466, [that] "a sentence above the presumptive statutory term based solely on a judicial finding of aggravating factors, other than a prior criminal conviction, violates a defendant's Sixth Amendment jury trial guarantee." Recognizing, however, that "[f]ull retroactivity would overwhelm our courts with resentencings and impose a devastating burden on the judiciary," the Court limited its holding to cases on direct appeal as of the date of its [Natale] decision or to those defendants who raised Blakely claims at trial or on direct appeal. Id. at

> 494. [Adamson's] direct appeal did not raise the constitutional validity of our sentencing scheme and was filed more than four years prior to the decision in Blakely. Accordingly, [Adamson's] constitutional claims [requesting re-]sentencing are not cognizable on this appeal.

Id. at 12-13.

Applying to the Supreme Court of New Jersey for certification, Adamson did not offer any counter-argument to the Appellate Division's conclusion that Adamson's sentencing claim fell outside the limited retroactivity reach of Blakely or Natale. See State v. Adamson, A-5921-03T4 (a letter in lieu of a formal petition for certification, filed on November 9, 2005).

Adamson's Sentencing Challenge has been revived in this action.[10] The Instant Sentencing Challenge, as set forth in his memorandum accompanying Adamson's Petition, could be summed up into the following three points, the first two of which appear to be substantive ("Adamson's Substantive Argument"), while the third one appears to be procedural ("Adamson's Procedural Argument"):

1. The New Jersey Criminal Code contains two provisions dealing with extended prison term, N.J. Stat. Ann. § 2C:44-3 and N.J. Stat. Ann. § 2C:44-6c. Since the preamble of the former utilizes the phrase "[t]he court *may* . . . sentence [a convicted defendant] to an extended term," while the latter provides that the defendant "*shall* be sentenced by the court to an extended term," the distinction between the words "shall" and "may" qualifies Section 2C:44-3 as discretionary sentencing provision and Section 2C:44-6c as a mandatory one, even though both Sections allow imposition of an extended term solely on the basis of recidivism. However, under state case law, a discretionary extended term imposed pursuant to Section 2C:44-3 may be imposed only if there is a finding that the extended term is "necessary for the protection of the public from future offenses by defendant through deterrence." See Docket Entry No. 1-5, at 19-20 (emphasis in original).

2. At Adamson's sentencing hearing, the judge found Adamson, who had three previous convictions, to be "a person from whom the public must be protected." See id. at 20. Since the judge's finding that the public needed to be protected from Adamson was a fact, this judicial

[10] Although it is not clear that all aspects of Petitioner's sentencing arguments were presented at the state level, this Court will nevertheless consider the application on its merits as the substantive portions of the argument, i.e., that petitioner's sentence was illegal under Apprendi, was addressed at the state level. See supra note 4.

finding violated the rule applied by the United States Supreme Court in the Apprendi-Cunningham line of cases. See id. at 21-22. While the New Jersey courts invariably determined that a finding that the public needed to be protected from the defendant might be made on the basis of defendant's prior conviction, the logical leap connecting the prior convictions and the public's need for protection exceeds the permissible exception adopted by the Apprendi-Cunningham line of cases; such finding can only be made by the jury. See id. at 23-25.

3. The Appellate Division's conclusion that Adamson's sentencing fell outside the limited retroactivity reach of Blakely or Natale was incorrect by the very virtue of the Appellate Division's examination of the issue through the prism of Blakely, rather than that of Apprendi, which--in turn--triggered the limited retroactivity of Natale. Since Adamson's direct appeal was still in the pipeline at the time the Supreme Court's decision in Apprendi, Adamson cannot be deemed procedurally barred from relief and, therefore, his extended term must be vacated as based on un impermissible fact finding by a judge rather than a jury. See id. at 26-27.

Respondents filed an answer urging this Court to deny Adamson a writ, arguing that the Instant Sentencing Challenge raises a Blakely type of issue falling under the limited retroactivity of Natale. See Docket Entry No. 5, at 15-22. In response, Adamson filed a reply. See Docket Entry No. 6. The reply elaborated on Adamson's Procedural Argument as follows:

1. The sole rule pertinent to the Instant Sentencing Challenge is that of Apprendi, and that rule was never a "new rule" announced by the United States Supreme Court: the entire line of Apprendi-Cunningham cases is nothing but the same "not so new" Apprendi rule. Therefore, the Supreme Court of New Jersey made a procedural error in Natale by refusing to extend the right to re-sentencing beyond those defendants who raised Blakely on direct appeal. See id. at 9-10.

2. Natale created an "illusory remedy" because, under the post-Natale regime, a judge can re-sentence a criminal defendant to a term above the now eliminated presumptive maximum without a jury finding enabling such sentencing. See id. at 10-14.

**C. Conflict-of-Interest Implications**

An additional concern raised by the Instant Sentencing Challenge pertains to what appears to be a potential conflict of interest between Taylor and Adamson.

> [C]onflicts arise from divided loyalties . . . . The potential prejudice from an attorney's divided loyalties is not limited to any particular type of proceeding; while it may be true that most conflict issues arise in the trial context, it certainly does not follow that no conflicts of interest are possible absent a trial. . . . The

> [c]ourt [shall] not coerce [the litigant] into giving up his right to choice of counsel . . . . See Wheat [v. United States], 486 U.S. 153, 163 [(1988)] (given the difficulties inherent in foreseeing the development of conflicts of interest, trial courts "must be allowed *substantial latitude*" in their handling of conflicts issues). [The litigant's] own statements, as well as those of . . . his attorneys, [might be accepted by the court during a court proceeding as] indicat[ing] that [the litigant] knowingly, intelligently and voluntarily [prefers] to proceed with [the conflicted attorney] as his counsel. See Blackledge v. Allison, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity").

United States v. Pryor, 275 Fed. App'x 99, 102-03 (3d Cir. 2008) (emphasis added).

Here, there appeared to be a conflict of interest between Taylor and Adamson because Adamson raised an ineffective assistance of counsel argument as to Taylor's performance on direct appeal in Adamson's post-conviction relief brief. The issue was resolved at oral argument of petitioner's application, wherein he confirmed to this Court that, although he had alleged ineffective assistance of counsel on Taylor's part in a previous proceeding, he no longer alleged such ineffective assistance, that he understood that his failure to bring an ineffective assistance argument in this petition would cause it to be forever waived, and that he was further satisfied to have Taylor represent him with regard to the instant petition. On this basis, the Court deems the conflict of interest waived. Therefore, this issue is moot. See supra note 4.

### D. The Instant Sentencing Challenge Shall Be Dismissed

#### 1. *Adamson's Procedural Argument Fails to State a Colorable Federal Claim*

Adamson's Procedural Argument, scattered throughout the pages of Adamson's memorandum and reply, can be summarized into the following contention: the Supreme Court of New Jersey erred in Natale (a) by not guaranteeing that the state courts would re-sentence eligible defendants (previously sentenced to an Upper Half Term on the basis of judicial fact-finding) to a Lower Half Term ("First Procedural Aspect"), and (b) by not including into the pool

of defendants eligible to be re-sentenced those individuals whose conviction became finale before the United States Supreme Court issued its Blakely decision ("Second Procedural Aspect"). See Docket Entry No. 1-5, at 26-27; Docket Entry No. 6, at 9-14.

In the Second Procedural Aspect, Taylor challenges the temporal scope of retroactivity selected by the Supreme Court of New Jersey in Natale by asserting that the re-sentenced convicts should necessarily end up better off after the re-sentencing, and the pool of such favorably re-sentenced convicts should be enlarged to include, at the very least, those whose cases were "in pipeline" at the time when the United States Supreme Court issued its Apprendi decision. Adamson therefore argues that, if he is entitled to re-sentencing under the Apprendi principles, then he should be re-sentenced to the presumptive maximum term (applicable to Adamson's offences and existing at the time of his conviction) because Adamson's case was on direct appeal when Apprendi was decided. See id.

Adamson's Second Procedural Aspect poses a two-prong inquiry, largely academic for the purposes of this Court's § 2254 review, i.e.: (1) whether the holding of Blakely is a "new rule" in comparison with that of Apprendi; and, if so, (2) whether the rule enunciated by the Supreme Court of New Jersey in Natale was a Blakely-type of rule or that of an Apprendi type.

In Teague v. Lane, 489 U.S. 288 (1989) and subsequent cases, the United States Supreme Court laid out the framework to be used in determining whether a rule announced in one of the Court's opinions should be applied retroactively to judgments in criminal cases that are already final on direct review. See Whorton v. Bockting, 549 U.S. 406, 127 S. Ct. 1173, 1180 (2007).

> Under the Teague framework, an old rule applies both on direct and collateral review, but a new rule is generally applicable only to cases that are still on direct review. See Griffith v. Kentucky, 479 U.S. 314 (1987). A new rule applies retroactively in a collateral proceeding only if (1) the rule is substantive, or (2) the

> rule is a "'watershed rul[e] of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." Saffle [v. Parks, 494 U.S. 484,] 495 [(1999)].

Id. at 1180-81.

For Teague purposes, a new rule is one of "procedure" if it affects the operation of the criminal trial process, and a new rule is one of "substance" if it alters the scope or modifies the applicability of a substantive criminal statute. See Bousley v. United States, 523 U.S. 614, 620 (1998). Each overruling of state sentencing laws in the Apprendi-Cunningham line of cases was clearly a procedural rule, since it affected the operation of the criminal trial process, but did not affect the scope of a substantive criminal statute.

> Under Teague, the determination whether a constitutional rule of criminal procedure applies to a case on collateral review [requires the court to] ascertain the "legal landscape as it then existed," Graham v. Collins, 506 U.S. 461, 468 (1993), and ask whether the Constitution, as interpreted by the precedent then existing, compels the rule, Saffle, [494 U.S.] at 488. That is, the court must decide whether the rule is actually "new."
>
> . . .
>
> [The court] must therefore assay the legal landscape as of [the pre-Blakely time] and ask "whether the rule later announced in [Blakely] was dictated by then-existing precedent--whether, that is, the unlawfulness of [Blakely's sentence] was apparent to all reasonable jurists." Lambrix [v. Singletary, 520 U.S. 518,] 527-528 [(1997)].
>
> . . .
>
> [A] generalized [preceding] rule . . . could be thought to support the Court's conclusion in [the following rule]. But what is essential here is [whether] it does . . . mandate the [following] rule. [If] reasonable jurists could have differed as to whether the [preceding] principle compelled [the following rule, the following rule must be deemed "new"]. See Lambrix, 520 U.S. at 527-528. But there is no need to guess [whether reasonable jurists could have differed as to the apparentness of the following rule if any of the] Justices dissented [when the following rule became law, especially if the dissenting opinions were distinguishing the preceding rule from the following rule].

Beard v. Banks, 542 U.S. 406, 411-16 (2004).

In the case of Blakely, there is no question that Blakely was a "new rule," as compared to Apprendi, since a generalized principle of Apprendi supported but did not mandate the holding of Blakely, as evidenced by thirty-three pages of different dissenting opinions filed by Chief Justice Rehnquist and Justices O'Connor, Breyer, and Kennedy, each drawing distinctions between Blakely and Apprendi. See Blakely v. Washington, 542 U.S. at 313-46; accord Apprendi v. New Jersey, 530 U.S. at 523-66.

While Adamson is of the impression that neither the rule in Apprendi nor that in Blakely was a "new rule," see Docket Entry No. 6, at 10, the federal courts uniformly concluded to the contrary and refused to apply retroactively any decision from the Apprendi-Cunningham line, Blakely included. See, e.g., Lloyd v. United States, 407 F.3d 608, 615-16 (3d Cir. 2005) (observing that Blakely did not contain directions indicating that a retroactive rule was announced by the Supreme Court); see also Yuzary v. Samuels, 269 Fed. App's 200, 201 (3d Cir. 2008) ("The Supreme Court has not made Blakely retroactive to cases on collateral review") (citing In re Olopade, 403 F.3d 159 (3d Cir. 2005)).

The second prong of the Second Procedural Aspect is a determination of whether the decision by the Supreme Court of New Jersey in Natale was a ruling based on the holding of Blakely rather than Apprendi. The answer, obviously, is in the facts and law of Natale. In Natale, the Supreme Court of New Jersey: (a) assessed New Jersey's sentencing scheme, which provided for statutory maximums and minimums but also referenced presumptive sentences, which fell somewhere in between; and (b) eliminated presumptive sentences. See State v. Natale, 184 N.J.

458. Concluding that the elimination of presumptive sentences was necessary, the Natale court reasoned as follows:

> In Blakely v. Washington, the Court refined Apprendi, by clarifying what constituted the statutory maximum for sentencing purposes. . . . Under Washington's law [stricken in Blakely] a judge [could] impose a sentence above the standard range if he f[ound] 'substantial and compelling reasons justifying an exceptional sentence. . . . The Supreme Court observed that the trial court's factfinding of [an element of the crime] was neither admitted by the defendant [who took the plea nor could have been found by a jury, had the jury been presented with an injury as to the elements to which the defendant pled guilty]. The Court defined the "statutory maximum" for Apprendi purposes as the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. . . . As such, the Court found that Washington's sentencing procedure violated the Sixth Amendment. . . . Courts in states with sentencing schemes similar to our own have reached varying conclusions regarding the impact of Blakely and Booker, [the case following and building up on Blakely,] on presumptive sentencing. Some [like the courts in Indiana, Arizona, Minnesota and Oregon,] have held that . . . an increase in the sentence above the presumptive based on judicial findings violates the Sixth Amendment. Others, including the Supreme Court of California, have concluded that there is no Sixth Amendment impediment when a judge increases a sentence above the presumptive term, but within the statutory range, based on discretionary judicial findings. We reject the California approach because it appears to be in direct conflict with Blakely.[11]

Natale, 184 N.J. at 475-82.

The foregoing excerpt unambiguously indicates that Natale was a decision mandated, factually and legally, by Blakely rather then by Apprendi. And, since Blakely was the governing "new rule," the holding of Natale was necessarily subject to limited collateral retroactivity with respect to those defendants who raised a Blakely argument prior to attaining finality of their

[11] California's determinate-sentencing system was stricken down by the United States Supreme Court in Cunningham v. California, 549 U.S. 270, with Justices Alito, Kennedy and Breyer, dissenting and expressing the view that California's sentencing system was indistinguishable from the advisory guidelines approved in Booker.

convictions.[12] Consequently, Adamson's challenge to the temporal scope of retroactivity selected by the Supreme Court of New Jersey in Natale is without merit. However, and paramountly here, it is also of no relevance to Adamson's Apprendi-based argument.

Here, Adamson attacked the temporal scope of retroactivity selected by the Supreme Court of New Jersey in Natale by stating:

> As generally acknowledged by the New Jersey Supreme Court: "To the extent that retroactivity issues arise in the context of criminal-procedure decisions implicating rights guaranteed under the federal constitution, United States Supreme Court precedents control the scope of retroactivity." State v. Lark, 117 N.J. 331, 335 (1989); see also Am. Trucking Eastness v. Smith, 496 U.S. 167, 178 (1990) ("In order to ensure the uniform application of decisions construing constitutional requirements and to prevent States from denying or curtailing federally protected rights, we have consistently required that state courts adhere to our retroactivity decisions"). Since Adamson's convictions were not final until . . . after Apprendi was decided in 2000, [Adamson's] extended term sentence must be vacated. See Allen v. Reed, 427 F.3d 767, 770 (10th Cir. 2005) (in applying Apprendi, "If the conviction is not yet final when the Court announces the rule, lower courts must apply that rule to the defendant's case"); Vogt v. Novak, 153 Fed. [App'x] 474, [476] (10th Cir. 2005) (in the context similar to Adamson's whereby state prisoner asserted [an] Apprendi violation for the first time on state post-conviction relief, Apprendi applied since petitioner's "conviction was not final at the time Apprendi was decided").

[12] In other words, Natale was not a "new rule." Rather, it was a "'watershed rul[e] of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding," Saffle, 494 U.S. at 495, and applying a binding Supreme Court precedent set forth by the "new rule" in Blakely. See Natale, 184 N.J. 458 (where the unanimity of the Natale court verified the fact that Blakely was the binding precedent Natale followed). Consequently, if the Natale court erred constitutionally, it erred only in its observation that it had options of applying the Natale-coined rule prospectively, without regard to the date of the United States Supreme Court's issuance of Blakely. See Natale, 184 N.J. at 494 ("[W]e can apply the new rule in one of three ways: (1) purely prospectively to all cases, (2) prospectively to all cases but the case in which the rule is announced, or (3) retroactively to cases in the pipeline."). However, this oversight does not impact the validity of Natale holding, since the Supreme Court of New Jersey correctly chose the option of "applying [the] holding [of Natale] to defendants with cases on direct appeal as of the date of [the Natale] decision and to those defendants who raised Blakely claims at trial or on direct appeal who raised Blakely claims." Id.

Docket Entry No. 1-5, at 26-27. In other words, Adamson asserts that the court in Natale was obligated but failed to follow the federal retroactivity rule *because* the federal courts presented with Apprendi challenges (raised by petitioners eligible to state such challenges) entertained such challenges. "These allegations mix apples and oranges, and many other fruits as well." In re Ins. Brokerage Antitrust, 2007 U.S. Dist. LEXIS 25632, at *122 (D.N.J. Apr. 5, 2007).

As discussed above, the court in Natale adopted the temporal retroactivity identical to that employed by the federal courts: it made the Natale rule retroactively applicable as to the petitioners whose convictions were not final at the time when Natale, was decided. This retroactivity decision of the Natale court has nothing to do with the fact that the United States Court of Appeals for the Tenth Circuit in Allen and Vogt found that the petitioners who *actually raised* Apprendi-based challenges during their appellate or post-conviction-relief proceedings deserved an Apprendi review.

A state court's decision, like Natale, does not become wrongly decided simply because it is inapposite to the case at bar. If Adamson wished to raise an Apprendi-based challenge during his first or second post-conviction proceeding, he certainly could have done so. However, Adamson did not raise such a challenge during his second post-conviction review, and Adamson expressly built Adamson's first post-conviction challenges on Blakely. See Docket Entry No. 3, ¶ 11; State v. Adamson, A-5921-03T4, Br. and App'x on Behalf of Def. (filed on Jan. 28, 2005). Moreover, as discussed above, Adamson wholly ignored Apprendi on direct appeal. See State v. Adamson, A-2652-98T4, Br. and App'x on Behalf of Def., at 11-12, (filed Sep. 30, 1999). Adamson's failures to raise an Apprendi challenge during Adamson's appellate and post-conviction-review proceedings cannot render the retroactivity of Natale erroneous. Similarly, the

state courts' decision that Adamson's Blakely-based claim was barred by the retroactivity limit set forth in Natale does not have anything to do with Adamson's instant desire to litigate an Apprendi challenge: no state court rejected Adamson's Substantive Argument based on Apprendi because no state court was ever presented with such claim. For these reasons, the Second Procedural Aspect, same as the entire Adamson's Procedural Argument, will be dismissed for failure to state even a colorable federal claim.[13]

**2. *Adamson's Substantive Argument Has No Merit***

Adamson's Substantive Argument is as follows -- Adamson's trial judge's decision to sentence Adamson to an extended term of imprisonment was a violation of Adamson's Sixth Amendment right to a jury trial, under the Apprendi - Cunningham line of cases, because the judge: (a) found that Adamson was eligible for an extended term of imprisonment and, in addition, (b) found the presence of public protection interest warranting the imposition of such extended term.

While conceding that the judge properly made the eligibility finding on the basis of Adamson's three prior convictions, Taylor maintains that the finding of the public protection interest had to be made by a jury.

By now, it is well established that "[ j]udicial factfinding in the course of selecting a sentence within the *permissible range* does not implicate or offend the Fifth and Sixth

[13] The issue of whether the Natale court erred in deciding that the defendants who are subject to a Natale-based re-sentencing could be re-sentenced to an Upper Half Term is even further removed from Adamson's Substantive Argument based on Apprendi and, thus, falls outside this Court's § 2254 review of the instant Petition: it is a purely academic exercise. Nevertheless, in the interests of completeness, the Supreme Court of New Jersey articulated in State v. Pierce, 188 N.J. 155, 174 (2006) that a "defendant may not be subjected to a sentence in excess of the one previously imposed" when being re-sentenced pursuant to Natale.

Amendment rights to a jury trial . . . ." United States v. Grier, 449 F.3d 558, 564-55 (3d Cir. 2006) (emphasis added). The issue of what exactly constitutes this "permissible range" for the purposes of defendants who are persistent offenders was tackled by the New Jersey courts. Specifically, the Supreme Court of New Jersey addressed the issue in Pierce, 188 N.J. 155, a case substantively identical to Adamson's scenario.

In Pierce, the defendant, having been convicted of robbery and various weapon-related charges was designated a persistent offender, under N.J. Stat. Ann. § 2C:44-3, and sentenced to forty years with a sixteen-year parole ineligibility component. The defendant asserted that the imposition of the extended term violated his Sixth Amendment rights because it involved an impermissible judicial fact-finding as to the need to protect the public. When the Appellate Division affirmed the defendant's sentence, he sought certification from the Supreme Court of New Jersey, which observed as follows:

> [T]he specific judicial finding of "necessity to protect the public" added by operation of Dunbar . . . , involves an evaluation of the "entire person of the defendant before the sentencing court," [State v. Dunbar, 108 N.J. 80, 91 (N.J. 1987), overruled by State v. Pierce, 188 N.J. 155 (2006)], and necessarily encompasses a judicial assessment and finding that goes beyond the objective facts of a defendant's criminal-conviction record. . . . [T]he judicial finding of "need to protect the public" exceeds a mere finding of the existence of a prior conviction. It is unlike an examination of the record of a prior conviction in order to determine whether the earlier conviction qualifies as the type required by an enhancement statute. . . . Rather, Dunbar's supplemental finding, from the inception, contemplated an added factual assessment of the defendant's whole person. See [State v.] Roth, 95 N.J. [334,] 360 [(1984)] (noting that central focus in second-tier sentencing provisions of enhanced-term statutes is on offender-related characteristics) . . . . Thus, the "need to protect the public" finding does not fit within the limits of the prior-conviction exception recognized in Blakely. . . . The determination calls for a finding beyond the pure fact of the prior conviction, and involves the very exercise of judicial discretion. See State v. Foster, 109 Ohio St. 3d 1 (2006) (examining statutorily required judicial finding of "need for protection of public" when sentencing repeat offenders and concluding that that finding violates Apprendi and Blakely).

> That said, in light of the Supreme Court's [Apprendi and Blakely] decisions, we must . . . set in proper perspective the timing and purpose of the judicial fact-finding related to the "need for protection of the public." That finding is not made until after a defendant has been determined to be subject, for Apprendi purposes, to a sentence up to the maximum of the discretionary extended-term range based on statutory eligibility as a persistent offender. The determination of the length of sentence imposed on a defendant and whether that sentence should be within the permissibly enhanced range are, and henceforth must be regarded as, separate and distinct from the court's determination of the top of the entire range of sentences to which a defendant is potentially subject as a persistent offender. The sentencing court must first, on application for discretionary enhanced-term sentencing under N.J. [Stat. Ann.] 2C:44-3(a), review and determine whether a defendant's criminal record of convictions renders him or her statutorily eligible. If so, *then the top of the range of sentences applicable to the defendant, for purposes of Apprendi, becomes the top of the enhanced range.* Thereafter, whether the court chooses to use the full range of sentences opened up to the court is a function of the court's assessment of the aggravating and mitigating factors, including the consideration of the deterrent need to protect the public. Consideration of the protection of the public occurs during this phase of the sentencing process.

Pierce, 188 N.J. at 167-68 (emphasis added).

In other words, the state courts' position is that the right to Apprendi-mandated jury fact-finding attaches only to the first step, i.e., the stage of determining the *range* of the sentence a criminal defendant is exposed to; once it is established that the defendant is eligible for an extended sentence, the sentencing judge, during the second step of sentencing, i.e., during the actual imposition of an extended term, is entitled, under Apprendi, to make factual findings supporting a prison term within the entire range of the sentence that starts from "the minimum of the ordinary-term range and ends] at the maximum of the extended-term." [14] Id. at 169.

[14] Where, within that range of sentences, the court chooses to sentence a defendant remains in the sound judgment of the court--subject to reasonableness and the existence of credible evidence in the record to support the court's finding . . . . On appellate review, the court will apply an abuse of discretion standard to the sentencing court's explanation for its sentencing decision within the entire range.

Pierce, 188 N.J. at 169-70.

It follows that Adamson's Substantive Argument is wholly inapposite to the state courts' position.  Here, Adamson *concedes* that his persistent offender status rendered Adamson eligible for a discretionary extended term.  See Docket Entry No. 1-5, at 22; Docket Entry No. 6, at 13. In light of the state courts' position in Pierce, that concession should have ended the inquiry.

However, in his reply, Adamson further argues:

> Contrary to the State's assertion, Apprendi provided the rule, not new, which was in effect during the pendency of Adamson's direct appeal:
>
>> Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.
>
> Apprendi v. New Jersey, 530 U.S. [at] 490 . . . . That rule is especially on point here since Adamson, as Apprendi, *was subjected to an extended term of imprisonment* . . . .

Docket Entry No. 6, at 10 (emphasis added).

The excerpt suggests Adamson's potential disagreement with the proposition that the "statutory maximum" discussed in Apprendi could be construed, as it was done in Pierce, to mean the "entire range" of sentence spreading from "the minimum of the ordinary-term range and [to] the maximum of the extended-term," Pierce, 188 N.J. at 169-70, i.e., that the language of Apprendi inherently prohibits any merger of the term applicable to a particular offense with the applicable extended term into an "entire range" spreading from "the minimum of the ordinary-term range [to] the maximum of the extended-term."  If Adamson meant to so argue, his claim is without merit.

> The constitutional guarantees of "trial. . . by an impartial jury," U.S. Const. amend. VI, and "due process of law," U.S. Const. amend. V, stand as a bulwark of individual liberty.  . . .
>
> This principle is rooted in common law considerations of fundamental fairness. See, e.g., Blakely v. Washington, 542 U.S. 296, 301-02, 305-07, 311-12 . . . ;

> Apprendi, 530 U.S. at 476-77; Harris v. United States, 536 U.S. 545, 556-68 (2002) (plurality opinion). Individuals must be provided notice of the consequences of their conduct. They must be informed of the nature of illegal acts, . . . *and of the possible sentences for those offenses upon conviction*. See Blakely, 542 U.S. at 301-02, 306-07, 311-12; Apprendi, 530 U.S. at 476-77, 489-94; Harris, 536 U.S. at 556-68. *An individual who is provided such notice and is nevertheless found guilty by a jury beyond a reasonable doubt to have engaged in illegal conduct has no grounds to complain when the maximum punishment authorized by the legislature is meted out by a judge*. See Blakely, 542 U.S. at 304-05, 309; Harris, 536 U.S. at 556-68. . . .

Grier, 449 F.3d at 564-55 (emphasis added).

This is a two-pronged inquiry. First the court must determine whether the provision at issue expressly put the defendant on notice as to the existence of an extended term. If yes, then the court must determine whether, under this provision, the fact that defendant's *eligibility* for an extended term requires a factual finding by a jury, pursuant to the holding of Apprendi.

Here, New Jersey law provides an express notice to persistent offenders; that notice reads: "[t]he court may . . . sentence a person who has been convicted of a crime of the first, second or third degree to an extended term of imprisonment if it finds one or more of the grounds specified in subsection a., b., c., or f. of this section. (a) The defendant has been convicted of a crime of the first, second or third degree and is a persistent offender." N.J. Stat. Ann. § 2C:44-3(a). Section 2C:44-3(a) clearly meets the notice requirement: a persistent offender "provided [with] such notice and found guilty by a jury [on the applicable underlying offense] has no grounds to complain when the maximum punishment authorized by the legislature [and ranging to the maximum extended term] is meted out by a judge." Grier, 449 F.3d at 564-55.

In that sense, the notice aspect as to the maximum punishment ensuing from Section 2C:44-3(a) is qualitatively different from the notice aspect existing with respect to the maximum punishment, which had been set forth in Section 2C:44-3(e) and was invalidated by the Supreme

Court in Apprendi as constituting a separate offense subject to additional fact-finding by a jury. Additionally, here, Adamson admits that he was a persistent offender, and was thus subject to an extended term on that basis. Wholly different from the facts of Apprendi, Adamson meets the notice requirements set out in Grier.

Consequently, Adamson simultaneously states two opposite positions, but only the one he is conceding, i.e., the right of the trial judge to determine the fact of Adamson's eligibility, is correct. Adamson's concession ends up this Court's § 2254 inquiry. The judicial fact-findings made by Adamson's trial judge afterwards, i.e., the findings made in order to impose a particular term selected by the judge from the "entire range" of the juxtaposed sentence, spreading from "the minimum of the ordinary-term range [to] the maximum of the extended-term," did not violate the rule of Apprendi. The state courts decision to that effect in Pierce was not an unreasonable application of the Supreme Court precedent. The Court, therefore, finds Adamson's Substantive Argument without merit. Having no other claims raised by Adamson due to Adamson's waiver of all other challenges, and being precluded by Section 2254's mandate from raising any challenges that the Court discerns on its own, the Court dismisses the instant Petition, with prejudice.

## V. Certificate of Appealability

The Court next must determine whether a certificate of appealability should issue. See Third Circuit Local Appellate Rule 22.2. The Court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

When a court denies a habeas petition on procedural grounds, the prisoner must

demonstrate that jurists of reason would find it debatable: (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether the court was correct in its procedural ruling.  See Slack v. McDaniel, 529 U.S. 473, 484 (2000).  "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further."  Id.  Further, to the extent that the Court may have determined subtle nuances of claims that were not fully exhausted in the state proceedings on the merits, a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(C)(2), but "[a] petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

Here, the Petition has failed to make a substantial showing of the denial of a constitutional right to Adamson, and the Court is persuaded that jurists of reason would not disagree as to this conclusion.  Therefore, no certificate of appealability will issue.

**CONCLUSION**

For the foregoing reasons, this Court dismisses the Petition and denies Adamson a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. No certificate of appealability will issue, pursuant to 28 U.S.C. § 2253(C)(2). An appropriate order accompanies this Opinion.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

Dated: July 30, 2009